**OBERWEIS DAIRY, INC., Plaintiff,**

v.

**ASSOCIATED MILK PRODUCERS, INC., et al., Defendants.**

No. 72 C 1404.

United States District Court, N.D. Illinois, E.D.

Dec. 30, 1982.

---

Victor M. Harding, Whyte & Hirschboeck, Milwaukee, Wis., Worth Rowley, Rowley & Watts, Washington, D.C., for plaintiff.

Donald M. Barnes, Arent, Fox, Kinter, Plotkin & Kahn, Washington, D.C., Kael B. Kennedy, Katten, Muchin, Gitles, Zavis, Pearl & Galler, Chicago, Ill., for defendant AMPI.

Sydney Berde, and Richard M. Hagstrom, Berde & Hagstrom, St. Paul, Minn., for defendant CMPC.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Oberweis Dairy, Inc. ("Oberweis") has sued Associated Milk Producers, Inc. ("AMPI") and Central Milk Producers Cooperative ("CMPC")[1] alleging violations of the Sherman Act, 15 U.S.C. §§ 1 and 2. Oberweis has moved for summary judgment on the issue of liability, contending AMPI and CMPC are collaterally estopped from litigating that issue as a result of the holding in *Alexander v. National Farmers Organization,* 687 F.2d 1173 (8th Cir.1982). In turn AMPI and CMPC have moved for "partial summary judgment" on certain Oberweis claims. For the reasons stated in this memorandum opinion and order:

1. This Court finds (a) certain facts and issues have been determined with preclusive effect in *Alexander* and (b) AMPI and CMPC are collaterally estopped from relitigating those facts and issues in this action.

2. This Court denies the AMPI–CMPC motion.

### Background

Oberweis is a dairy engaged in the business of buying raw milk and marketing Grade A milk in the greater Chicago area.[2] AMPI is a large dairy cooperative. CMPC is a federation of cooperatives, including AMPI. Dairy cooperatives operate to increase the market power of member dairy farmers by various means.[3]

*Alexander* was a private antitrust action begun in 1971 when a large dairy cooperative, Mid-America Dairymen, Inc. ("Mid-Am") sued National Farmers Organization ("NFO"), a rival organization of dairy and other farmers. NFO counterclaimed against Mid-Am, AMPI, CMPC and others, and AMPI counterclaimed against NFO. At the District Court level all substantive antitrust claims of the parties were rejected. *In re Midwest Milk Monopolization Litigation,* 510 F.Supp. 381 (W.D.Mo.1981) ("*Midwest Milk*").

On appeal the conclusion NFO had not violated the antitrust laws was affirmed on other grounds. But the Court of Appeals for the Eighth Circuit found "Mid-Am, AMPI and CMPC did conspire to monopolize milk and eliminate competition through

---

1. Only AMPI and CMPC remain among the many defendants originally named in this action a decade ago. Attrition has taken its toll. Pl. Mem. 2 n.*.

2. "Chicago Regional Marketing Area" is defined as a dairy market by the United States Department of Agriculture ("USDA") and is subject to minimum price and other regulations under a so-called Federal Market Order. *See Alexander,* 687 F.2d at 1180 n. 2.

3. *Alexander,* 687 F.2d at 1179–80 described the economics of the milk industry in the Midwest. Those economics need not be recounted here.

the use of predatory, anticompetitive and unlawful tactics." *Alexander,* 687 F.2d at 1179.[4] Oberweis invokes *Alexander* in its effort to preclude AMPI and CMPC from litigating their liability in this action.

By way of counterattack, AMPI and CMPC contend they are entitled to "partial summary judgment" on Oberweis' claims for damages arising from:

    1.  purchases of raw milk from suppliers not controlled by AMPI or CMPC;

    2.  handling, hauling and premium charges for certain raw milk in purchases from AMPI–CMPC; and

    3.  alleged AMPI–CMPC acts with co-conspirators.

AMPI and CMPC contend the first type of claim is barred under the "indirect purchaser" doctrine of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). As for the other two types, they contend Oberweis (a) has not produced in the discovery process, (b) is now precluded from producing or (c) admittedly does not have any factual evidence supporting those claims.

### Oberweis' Motion

Oberweis has miscast its current motion as one seeking summary judgment on AMPI–CMPC *liability.* As Oberweis' own Mem. 5–8 indicates, it rather wants a ruling that (1) certain specific facts and issues have been determined in *Alexander* and (2) AMPI and CMPC are precluded from relitigating those issues here. Summary judgment "on the issue of liability alone" is appropriate under Fed.R.Civ.P. ("Rule") 56(c) only when a party has moved under Rule 56(a) or 56(b) and has established there is no genuine issue of fact material to liability, but the court does find a genuine issue as to the amount of damages. Though the Rules provide no specific procedural vehicle for the relief Oberweis seeks, Rule 16 comes closest to doing so. *See Wetherill v. University of Chicago,* 548 F.Supp. 66, 67 & n. 3 (N.D.Ill.1982).

■ Even apart from that procedural problem, *Alexander* could not conceptually have determined AMPI–CMPC's liability to Oberweis. "[B]efore the private plaintiff in an antitrust action can recover damages, he must establish not only that the defendant has violated the antitrust laws, but also that the violation proximately caused injury to his business or property." 15 J. Von Kalinowski, *Antitrust Laws and Trade Regulation* § 111.01, at 111–1 (1981) ("Von Kalinowski"). *Alexander* did decide AMPI and CMPC conspired in violation of the antitrust laws, but their liability in *that* action necessarily depended on the Court's also finding "that NFO was a specific target of the conspiracy." 687 F.2d at 1191.

There was of course no corresponding finding in *Alexander* that the AMPI–CMPC conspiracy "proximately caused injury to" or targeted Oberweis' business. Oberweis cannot therefore be put in a position where "only the issue as to the amount of damages" remains in this action. Oberweis Motion at 1. That issue can be reached only after Oberweis satisfies its burden as to causation. 15 Von Kalinowski § 111.01, at 111–1 to 111–2. Any collateral estoppel effect of *Alexander* cannot and does not eliminate that burden.

Oberweis' mischaracterization of its motion has misdirected the argument between the parties. Essentially three questions are really presented:

    1.  What relevant facts and issues did *Alexander* determine, with possibly preclusive effect?

    2.  Can Oberweis satisfy the general requirements for invocation of offensive collateral estoppel?

    3.  Are there specific reasons why collateral estoppel should not be applied against AMPI and CMPC in this action?

Those questions are addressed in turn.

    1.  *Alexander's Relevant Holdings*

*Alexander* found specifically (all these are direct quotes from the Court of Appeals' opinion):

---

**4.** However, based on the District Court's findings the Court of Appeals affirmed the dismissal of NFO's actual and attempted monopoliza-

tion claims against Mid-Am, AMPI and CMPC. *Id.* at 1191.

(a) In any commercially meaningful sense, Grade A milk is ... a relevant product market for antitrust purposes .... 687 F.2d at 1191.

(b) [T]he record reveals public assertions ... by CMPC that it represents over ninety percent of the producers selling into the Chicago market, and supplies over ninety percent of that market's fluid milk use. *Id.* at 1192.

(c) [T]he defendants do not seriously dispute, nor could they on this record, that they acted in concert with the intent to eliminate competition and gain sufficient control of milk to enable them to set higher prices. *Id.* at 1193.

(d) AMPI, Mid-Am and CMPC did conspire to monopolize and eliminate competition in the marketing of Grade A milk produced in the Midwest, through the use of discriminatory pricing, coercive supply disruptions and threats of similar conduct, as well as bad faith harassment and threats of litigation against independent buyers of NFO milk. *Id.*

(e) This conspiracy violates Sections 1 and 2 of the Sherman Act, notwithstanding the Capper-Volstead exemption [of cooperatives from certain antitrust law liability], because it involved the concerted use of predatory and other unlawful, anti-competitive means to eliminate competition and pursue monopoly power. *Id.* at 1191.

Then the Court of Appeals surveyed the defendants' overt acts, *id.* at 1194–1207, including some in the Chicago marketing region, *id.* at 1196–99. All the activity cited in that survey fell in the 1969–71 period, and there is nothing to indicate a holding of illegality either before or after those years.[5]

As AMPI points out (Ans. Mem. 13 n. 5) the Chicago-area overt acts described in *Alexander* occurred only in 1970–71.

█ In this action Oberweis claims damages allegedly arising from AMPI and CMPC conduct beginning in 1957 and continuing to date, Complaint ¶ 21, insofar as those fall within the statute of limitations, *id.* ¶ 26. But Oberweis has not responded to AMPI's point on the time frame of *Alexander*'s holding. Because *Alexander*'s findings relevant here are focused on the 1970–71 period, any collateral estoppel effect must be so limited.[6]

### 2. General Collateral Estoppel Principles

In *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) the Supreme Court described the doctrine of collateral estoppel:

Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.

Collateral estoppel is integral to civil practice because it permits conservation of adversarial and judicial resources and minimizes the possibility of inconsistent judicial decisions. *Id.* at 153–54, 99 S.Ct. at 973–74.

"Offensive" collateral estoppel, approved for the federal courts in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), permits a plaintiff to foreclose a defendant's relitigating an issue previously lost by that defendant in an action with another party. Even though that usage had been criticized by some courts and commentators, the Court held (*id.* at 331, 99 S.Ct. at 651–52, footnote omitted):

**5.** *Alexander* began (*id.* at 1179) by referring to "the often fierce competition in the Midwest milk industry during the late 1960's and early 1970's." It pointed out that the vigorous competition really began in 1969 when NFO commenced its direct marketing efforts. *Id.* at 1180. Mid-Am had just been formed in 1968 and AMPI in 1969. *Id.*

**6.** It is true that findings of fact relevant to the Chicago area in *Midwest Milk,* 510 F.Supp. at 476–87, cover the 1967–75 period, although it is

unclear whether some occurrences cited were relevant to determination of the issue of antitrust liability. In any case, Oberweis (as it must) calls on *Alexander* for collateral estoppel effect, so *Alexander*'s time frame would appear to govern. After all, the Court of Appeals reversed rather than affirming the District Court on the holding that controls here, and this Court must necessarily look to *Alexander* (not *Midwest Milk*) to define the scope of the Eighth Circuit's own decision.

We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied. The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

Determination of fairness requires the defendant to have had a "full and fair" opportunity to litigate the claims in the earlier action. *Id.* at 332, 99 S.Ct. at 652.[7]

Just last year the operative principles were restated in the context of a summary judgment motion in a private antitrust action, *GAF Corp. v. Eastman Kodak Co.,* 519 F.Supp. 1203, 1211–12 (S.D.N.Y.1981) (citations omitted):[8]

Briefly stated, the following are preconditions to the application of collateral estoppel: (1) the party against whom collateral estoppel is asserted must have been a party, or in privity with a party, to the prior action; (2) there must have been a final determination of the merits of the issues sought to be collaterally estopped; (3) the issues sought to be precluded must have been necessary, material, and essential to the prior outcome; (4) the issues sought to be precluded must have been actually litigated in the prior action, with the party against whom the estoppel is asserted having had a full and fair opportunity to litigate the issues; and (5) the issues actually and necessarily decided in the prior litigation must be

identical to the issues sought to be estopped.... In addition, in exercising its discretion, the trial court may only invoke offensive collateral estoppel when the plaintiff could not have easily joined in the prior action and when application of the doctrine would not be unfair to the defendant.

AMPI and CMPC would have done well to focus on those "preconditions" to Oberweis' use of collateral estoppel here.[9] Unfortunately, due in part to Oberweis' mischaracterization of its motion, AMPI and CMPC did not follow *GAF*'s logical and clear legal outline.

### 3. Application of Collateral Estoppel in This Action

■ Beyond doubt the principal *GAF* "preconditions" to offensive collateral estoppel have been met. AMPI and CMPC were defendants in *Alexander* and litigated that action fully over a decade. They had every reason to contest every issue in *Alexander* vigorously and under the same procedural conditions prevailing here. *See Pinto Trucking Service, Inc. v. Motor Dispatch, Inc.,* 649 F.2d 530, 533 n. 4 (7th Cir.1981). As a general matter, then, there is no element of potential unfairness to AMPI and CMPC. It remains to consider the specific objections raised by AMPI and CMPC.

AMPI and CMPC pose the legal question whether offensive collateral estoppel is available between private antitrust actions. Otherwise most of their objections go in one way or another to the finality of *Alexander,* to the identity of the issues involved in that and this action, and to certain allegedly questionable legal tests applied in *Alexander.* But throughout their discussion AMPI and CMPC have argued to avoid final liabil-

**7.** AMPI is no stranger to offensive collateral estoppel, having sought to employ the doctrine in *Alexander* in support of its counterclaim against NFO. *See* 687 F.2d 1189–90.

**8.** Like Oberweis, GAF asked inaccurately for "partial summary judgment," though it sought only to preclude litigation of certain facts and issues. 519 F.Supp. at 1210. Unlike Oberweis, however, it properly understood its substantive burdens.

*GAF* is apparently the only post-*Parklane* reported case applying collateral estoppel offensively from one private Sherman Act action to another. *See* 15 Von Kalinowski, § 109.04[5], at 109–29 to 109–32 (1981) and July 1982 Supp. § 109.04[5], at 7 n. 19.3.

**9.** AMPI and CMPC could also repair to the general law on issue preclusion (*see* Restatement (Second) of Judgments §§ 27–29 (1982) )—and they did that.

ity to Oberweis.[10] Having swallowed whole Oberweis' characterization, AMPI and CMPC wasted much of their effort instead of concentrating (as they should have) on why collateral estoppel as to specific issues and facts might be inappropriate here.[11]

### a. Collateral Estoppel in Private Antitrust Actions

■ AMPI (Ans. Mem. 3–5) and CMPC (Ans. Mem. 2–4) argue collateral estoppel is not available between private antitrust actions. Their argument is based on tortured legislative history and logic.

Before its amendment in 1980 Clayton Act § 5(a) (15 U.S.C. § 16(a)) provided a final judgment against a defendant in a governmental civil or criminal antitrust action "shall be prima facie evidence against such defendant" in a private antitrust action. In 1980 Section 5(a) was amended by adding:

> Nothing contained in this section shall be construed to impose any limitation on the application of collateral estoppel, except that, in any action or proceeding brought under the antitrust laws, collateral estoppel effect shall not be given to any finding made by the Federal Trade Commission under the antitrust laws or under section 45 of this title which could give rise to a claim for relief under the antitrust laws.

That amendment was intended to override some court decisions that had interpreted the former "prima facie evidence" language to preclude (inferentially) full collateral estoppel effect to a prior government action in a private action. See H.R. Rep. No. 874, 96th Cong., 2d Sess. 2–6, reprinted in 1980 U.S.Code Cong. & Ad. News 2716, 2752, 2752–56; National Comm'n for the Review of Antitrust Laws and Procedures, Report to the President

and the Attorney General, Antitrust & Trade Reg.Rep. (BNA) No. 897, at 29–31 (Jan. 18, 1979). Its entire focus was on the collateral estoppel effect to be given future government antitrust actions.

AMPI and CMPC somehow read into the amendment the notion that before 1980 there could be no collateral estoppel effect given to private antitrust actions in later private actions. They not only embrace the questionable restrictive reading of pre-amendment Section 5(a) but also infer the section had implicitly denied any collateral estoppel effect to private antitrust actions!

Instead the thrust of the 1980 amendment is precisely the opposite: Congress wanted to clarify the applicability of universal collateral estoppel principles to government antitrust actions, unfettered by a narrow reading of Section 5(a). This was the import of the National Commission's Report, id. at 30 (footnote omitted):

> [T]he majority of the Commission recommends that Congress amend the statute to make it clear that the prima facie effect afforded prior litigated judgments won by the government does not preclude courts, in their discretion, from applying in antitrust cases the principles of collateral estoppel now applicable in other types of litigation. A defendant who lost either a prior government or private suit could be precluded from relitigating against subsequent plaintiffs those issues fully and fairly contested and necessary to the result in the first action. In this way, the deterrent effect of the antitrust laws will be enhanced and complex antitrust cases can be litigated and adjudicated more efficiently.

AMPI and CMPC would distort the phrase "or private suit" to mean the Commission was recommending creating the possibility of collateral estoppel use of a private ac-

---

**10.** AMPI at least clearly sensed (Ans. Mem. 6, 13–14, 24–26) the basic misconception in Oberweis' motion, but it was evidently not confident enough to contest only the application of collateral estoppel as properly understood. CMPC never isolated Oberweis' mistake. See, e.g., CMPC Ans. Mem. 23 & n. 42, discussing AMPI–CMPC liability question as an issue of

"fairness" and as if collateral estoppel might be invoked on the liability issue.

**11.** AMPI and CMPC moved for and received leave to file over-length briefs on both motions. More thought and less paper would have been in order and more helpful to this Court.

tion. That is simply nonsense, for it is plain the Commission was rather seeking to make sure government actions were brought into parity with the existing status of private actions for collateral estoppel purposes.[12] *See* 15 Von Kalinowski § 109.04[5], at 109–29 to 109–32 and July 1982 Supp. § 109.04[5], at 5–7.

#### b. *Finality of Alexander*

■ AMPI implies (Ans. Mem. 2) and CMPC argues (Ans. Mem. 21–22) *Alexander* is not a final judgment on the merits. Of course *Alexander*'s being subject to review *en banc* or by the Supreme Court does not affect its finality. *See* 1B *Moore's Federal Practice* § 0.416[3], at 2252–53 (1982).[13]

#### c. *Identity of the Issues*

AMPI (Ans. Mem. 5–10) and CMPC (Ans. Mem. 11–14, 19–20, 23) contend the conspiracy in *Alexander* was not the same as the conspiracy alleged by Oberweis. That position makes sense only if translated into an argument *Alexander* could not establish AMPI–CMPC liability in this action. Otherwise the conspiratorial facts and issues determined in *Alexander* are identical to those here—though Oberweis is obligated to prove it too was a target of AMPI–CMPC antitrust violations found in *Alexander.* Even Oberweis came to see this dimly. R. Mem. 3–5, 8.

■ Nor is this conclusion altered by Oberweis' original opposition to consolidation of this case with *Alexander* for discovery

purposes. AMPI Ans. Mem. 8–9; CMPC Ans. Mem. 24. *Alexander* was a suit between competitors, involving claims of antitrust violations throughout the Midwest. Oberweis was a buyer operating in a limited market, so the two actions did not fully occupy the identical universe. Pl.R.Mem. 9. Yet that does not foreclose Oberweis' use *now* of AMPI–CMPC antitrust violations over time periods and in the geographic area covered by the Complaint here. It is irrelevant that the geographic areas of the two actions differ (AMPI Ans.Mem. 2, 10–12 and CMPC Ans.Mem. 14–15). What controls is that *Alexander included* this action's relevant area.

#### d. *Assertedly Differing Legal Standards*

AMPI (Ans.Mem. 2, 15–22) and CMPC (Ans.Mem. 6–11, 20–21) argue vigorously about *Alexander*'s supposed laxity in requiring a lesser showing of a relevant geographic market on NFO's conspiracy claims than on its actual and attempted monopolization claims against AMPI and CMPC. *See* 687 F.2d at 1181–82, 1192–93. True enough, the lesser showing was in part responsible for the Court of Appeals' reversing *Midwest Milk* on the conspiracy claims but affirming dismissal of the actual/attempted monopolization claims. That difference however related to NFO's effort to show a ten-state-wide conspiracy and monopolization—an effort found adequate as to the former but inadequate as to the latter. *Id.* at 1192–93.[14]

---

**12.** It must be remembered that before *Parklane*'s espousal of offensive collateral estoppel, Section 5(a) had created a special advantage for antitrust plaintiffs against defendants who had been the targets of government action. That had represented a congressional policy judgment favoring private antitrust actions. *Parklane* had then changed the ballgame in 1979 for *all* parties suing previously unsuccessful litigants. Next Section 5(a)'s 1980 amendment nullified any misguided negative inference that formerly-favored antitrust plaintiffs suing governmental-action losers were now at a comparative disadvantage. It would be bizarre indeed to read the amendment as depriving private antitrust plaintiffs of the benefits *Parklane* had made available to all other plaintiffs in every other area of law. See *GAF,* 519 F.Supp. at 1210–11.

**13.** In a related objection AMPI suggests (Ans. Mem. 1) *Alexander*'s "de novo" review of the evidence was improper. "De novo" misstates the nature of the Court of Appeals' review. *See* 687 F.2d at 1191, 1193–94, 1199. But even were it otherwise, that would not vitiate *Alexander*'s status as a final determination of liability on the merits.

**14.** It was the Eighth Circuit's view that a Sherman Act § 2 conspiracy claim needs no showing of actual attainment or "dangerous probability" of monopoly power, so long as the conspiracy affected "some appreciable part of interstate commerce." *Id.* at 1181–82, 1192–93.

■ What is significant for this case, though, is the *Chicago* market—and here there was *no* doubt about AMPI–CMPC antitrust violations under the strictest of standards. *Id.* at 1192, 1194, 1196–99, 1207. Thus even if *Alexander* were considered to have applied in some respects a legal rule different from one prevailing in this Circuit, *Alexander's* finding of antitrust violations in the Chicago market is available for collateral estoppel use in this action.

■ AMPI (Ans.Mem. 23–24) and CMPC (Ans.Mem. 18–19, 20) also object to *Alexander's* treatment of the *Noerr-Pennington* doctrine, under which joint efforts to influence public officials are not themselves illegal under the Sherman Act. *See* 687 F.2d 1195–96. AMPI and CMPC claim misuse of the doctrine led to the *Alexander* holding, precluding reliance on *Alexander* in this action and Circuit. That argument hardly merits discussion:

1. Application or non-application of the doctrine to NFO is totally irrelevant to liability as between Oberweis and AMPI–CMPC.

2. In any case even a cursory glance shows *Alexander's* use of *Noerr-Pennington* evidence was not crucial to its overall findings. *See* 687 F.2d at 1196.

### e. *Unfairness to AMPI–CMPC*

AMPI (Ans.Mem. 26–29) and CMPC (Ans. Mem. 22–26) assertions about the unfairness of applying collateral estoppel against them either (1) rehash the objections already discussed or (2) suggest no determination of their liability would be proper on Oberweis' motion. Neither set of arguments needs further discussion.

■ Still another "fairness" contention involves Oberweis' discovery shenanigans in this action. AMPI Ans.Mem. 6, 29; CMPC Ans.Mem. 24–26. But any Oberweis dis-

covery sins argue for appropriate sanctions under Rule 37, not for a reward to AMPI–CMPC on this motion. Moreover, the very contention comes with ill grace from AMPI, whose own discovery actions in *Alexander* were condemned as "outrageous" and as justifying "the most severe sanctions upon AMPI— . . . default judgment against it." 687 F.2d at 1205.[15]

### 4. *Summary*

■ This Court finds AMPI and CMPC collaterally estopped from relitigating the facts and issues referred to under "*Alexander's* Relevant Holdings": essentially whether Grade A milk is a relevant product market, whether AMPI and CMPC conspired to monopolize the market for Grade A milk and to eliminate competition in the Chicago Regional Market Area in the 1970–71 period, thus violating Sherman Act §§ 1 and 2, and whether they controlled over 90% of the Chicago market. Only those facts and issues, raised by Oberweis' multifarious claim for damages (Complaint ¶¶ 21–24, 26), have been determined adversely to AMPI and CMPC in *Alexander.* But those determinations ought to be and are given preclusive effect in this action.

### *AMPI–CMPC Motion*

One easy answer to AMPI–CMPC's "partial summary judgment" motion is there is no such animal in their terms. Rule 56(d) is not designed for the use AMPI–CMPC intend: "the singling out of limited issues on which the Court's advice may be obtained." *Mendenhall v. Barber-Greene Co.,* 531 F.Supp. 947, 948 (N.D.Ill.1981). *See also Malcak v. Cooney,* 93 F.R.D. 830, 831 n. 1 (N.D.Ill.1982).

■ Rule 56(d) does allow a court to determine some material *facts* "appear without substantial controversy," but only

15. AMPI was of course a member of CMPC (though that does not necessarily mean CMPC could be tarred with the same brush). Incidentally, that relationship is the basis for one last legal point raised by CMPC (Ans. Mem. 16–17) —that AMPI and CMPC could not conspire together. Apart from the group of cases up-

holding even parent-subsidiary conspiracies, CMPC runs directly counter to specific findings in *Alexander* about the distinction between AMPI and CMPC and the fact they acted in concert. *See e.g.,* 687 F.2d at 1180, 1194, 1197 n. 22, 1207.

when a party has moved unsuccessfully for a "full" summary judgment under Rule 56(a) or 56(b). Here AMPI–CMPC do not move for full summary judgment, nor do they really seek summary judgment on a "part" of a claim in the sense meant in the same Rules. Oberweis' Complaint (¶¶ 21–23, 26) states one single-count claim for damages, the "parts" of which are aspects of that whole claim rather than discrete "sub-claims." Essentially AMPI–CMPC want a ruling that certain Oberweis *damages* cannot be assessed or have not been proved. "Partial summary judgment" is their invented mechanism to gain that end.[16]

### 1. *Claimed Failures To Prove Damages*

█ Their focus on damages issues is most evident in the part of their motion dealing with (1) handling, freight and premium charges on Oberweis' purchases from AMPI–CMPC[17] and (2) alleged illegal acts of AMPI–CMPC and unnamed co-conspirators. Their whole argument in that area (Mem. 29–32, 32–34, 35–37; R.Mem. 18ff.) is that certain damages have not been shown in the discovery process.[18]

Even were Rule 56 susceptible to such use, Oberweis would be entitled to all favorable inferences from the facts of record, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). In that light even the claimed absence of specific facts on specific parts of Oberweis' damages claim would not mean AMPI–CMPC are now entitled to "partial" judgment as a matter of law. Because favorable inferences would be available to Oberweis from its more general factual showings (see Ans.Mem. 12–18, describing its discovery evidence), a ruling against Oberweis *on a Rule 56 motion* would be extremely unlikely. This suggests another reason why Rule 56 is really not fit for AMPI–CMPC's intended use.

### 2. *Illinois Brick Issue*

AMPI–CMPC make a different contention on a third set of claims, arising from Oberweis' purchases from 23 suppliers allegedly not controlled by AMPI–CMPC. Those claims, involving both raw milk prices and handling/service charges, are assertedly barred by the indirect purchaser doctrine of *Illinois Brick.* Mem. 19–27, 29; R.Mem. 10–18. Entirely aside from any

**16.** As Oberweis notes (Ans. Mem. 5–6), AMPI–CMPC in effect confess their creativity by altering a quotation from *Weit v. Continental Illinois National Bank and Trust Co.,* 641 F.2d 457, 464 (7th Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982), so it speaks of *partial* summary judgment on *portions* of a complaint. See AMPI–CMPC Mem. 18.

In much the same way AMPI–CMPC argue (Mem. 18 n. 7) the action culminating in *Illinois Brick* began with a partial summary judgment motion granted in this District Court. But that was a true partial summary judgment, entered against *all* claims by *all* indirect purchasers (not on *parts* of the claim of one antitrust plaintiff). *Illinois v. Ampress Brick Co.,* 67 F.R.D. 461, 463, 468 (N.D.Ill.1975), *rev'd,* 536 F.2d 1163 (7th Cir.1976), *rev'd sub. nom. Illinois Brick,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

Similarly, the two other cases cited by AMPI–CMPC (R. Mem. 8 n. 17) do not support their procedural posture. *First National Bank Co. of Clinton, Ill. v. Insurance Co. of North America,* 606 F.2d 760, 763, 765 (7th Cir.1979) upheld the district court's grant of partial summary judgment on plaintiff's full summary judgment motion. *Saunders v. National Basketball Ass'n,*

348 F.Supp. 649 (N.D.Ill.1972) also involved a full Rule 56 motion.

AMPI–CMPC alterations in *Weit,* coupled with their misuse of precedent, induce a suspicion of intentional dissembling. More charitably, perhaps they were simply incapable of perceiving the distinctions discussed.

**17.** Oberweis has now dropped its claim based on Class II milk premiums in purchases from AMPI–CMPC. Ans. Mem. 14 n. 5. As to Class II milk, see *Alexander,* 687 F.2d at 1180.

**18.** While this Court's ruling on the present motions was pending, Oberweis—without appearing in court for that purpose—"moved" to supplement its Interrogatory Answers. There is a sharp dispute as to the extent to which discovery remains open for that purpose, but in any case AMPI–CMPC are evidently furious over Oberweis' continuing discovery tactics. R. Mem. 1–2, 3–8. Again that whole issue speaks to possible sanctions for discovery abuse (AMPI–CMPC have moved for the ultimate sanction of dismissal of Oberweis' entire lawsuit) and not to the propriety of a "partial summary judgment" on some damages evidence.

Rule 56 considerations, AMPI–CMPC's appeal to *Illinois Brick* is misguided.

Clayton Act § 4 (15 U.S.C. § 15) provides a treble-damage remedy to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." On its face Section 4 "contains little in the way of restrictive language." *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979). Section 4 reflects Congress' broad remedial and enforcement purposes in enacting the antitrust laws. *See Pfizer Inc. v. India,* 434 U.S. 308, 313–14, 98 S.Ct. 584, 587–88, 54 L.Ed.2d 563 (1978).

*Illinois Brick* stated a limitation on the otherwise broad sweep of Section 4, holding indirect purchasers of concrete block were not parties "injured" within Section 4's meaning. 431 U.S. at 729, 97 S.Ct. at 2066. Such indirect purchasers obtained concrete block from general contractors, who in turn obtained the block from masonry contractors, themselves the direct purchasers from the defendant manufacturers. *Id.* at 726, 97 S.Ct. at 2064–65. Three interrelated reasons were held to bar Section 4 actions by both direct and indirect purchasers:

1. There was an unacceptable risk of duplicative recovery of damages from a single overcharge by an antitrust defendant. *Id.* at 730–31, 97 S.Ct. at 2066–67.

2. Splintered recoveries and litigation burdens under a rule requiring apportionment of damages among direct and indirect purchasers might chill private enforcement of the antitrust laws. *Id.* at 745–47, 97 S.Ct. at 2074–75.

3. Direct purchasers were the group most likely to press their claims vigorously under Section 4. *Id.* at 735, 97 S.Ct. at 2069.

*Illinois Brick*'s rationale was recently summarized and reaffirmed in *Blue Shield of Virginia v. McCready,* —— U.S. ——, 102 S.Ct. 2540, 2546, 73 L.Ed.2d 149 (1982). *McCready* held a health plan subscriber had Section 4 standing to sue for the plan's failure to reimburse psychotherapy expenses incurred for services provided by *psychologists,* while providing reimbursement for services rendered by *psychiatrists.* Although that distinction arguably harmed psychologists directly and subscribers only indirectly or remotely, *id.* 102 S.Ct. at 2544, the Court refused to apply *Illinois Brick* to bar recovery (*id.* 102 S.Ct. at 2546, footnote omitted):

[*Illinois Brick*] focused on the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws. But permitting respondent to proceed in the circumstances of this case offers not the slightest possibility of a duplicative exaction from petitioners. McCready has paid her psychologist's bills; her injury consists of Blue Shield's failure to pay her. Her psychologist can link no claim of injury to himself arising from his treatment of McCready; he has been fully paid for his service and has not been injured by Blue Shield's refusal to reimburse her for the cost of his services. And whatever the adverse effect of Blue Shield's actions on McCready's employer, who purchased the plan, it is not the employer as purchaser, but his employees as subscribers, who are out of pocket as a consequence of the plan's failure to pay benefits.

Moreover, the Court went on to hold McCready had satisfied the "[a]nalytically distinct" question whether her injuries were "too remote" from an antitrust violation. *Id.* 102 S.Ct. at 2547. It looked (*id.* 102 S.Ct. at 2548):

(1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and,

(2) more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

Surveying the facts, the Court concluded (*id.* 102 S.Ct. at 2549, 2551, citations and footnote omitted):

Where the injury alleged is so integral an aspect of the conspiracy alleged, there

can be no question but that the loss was precisely " 'the type of loss that the claimed violations ... would be likely to cause.' "

\* \* \* \* \* \*

As a consumer of psychotherapy services entitled to financial benefits under the Blue Shield plan, we think it clear that McCready was "within that area of the economy ... endangered by [that] breakdown of competitive conditions" resulting from Blue Shield's selective refusal to reimburse.

\* \* \* \* \* \*

Although McCready was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market. In light of the conspiracy here alleged we think that McCready's injury "flows from that which makes defendants' acts unlawful" ... and falls squarely within the area of congressional concern.

Oberweis (Complaint ¶ 23c-h) has alleged AMPI–CMPC control the price and supply of substantially all raw milk in the Chicago region (*see also* Ans.Mem. 2–3, 7). More critical to the present motion, there is evidence to indicate the AMPI–CMPC conspiracy controls the price of the raw milk Oberweis buys *from all its sources*.[19] Oberweis thus claims harm from all its purchases, harm caused by the AMPI–CMPC conspiracy. That provides the required "nexus" between AMPI–CMPC's violation and Oberweis' harm from purchases from the 23 separate suppliers.

Oberweis also asserts precisely the kind of injury with which Congress was concerned in providing the Section 4 remedy. It is irrelevant here, as in *McCready,* that Oberweis was not a competitor of AMPI–CMPC.[20] Finally (and controlling under

*McCready* and *Illinois Brick*) there is no danger of duplicative recovery here. No "chain of distribution" is involved, and the 23 suppliers are not potential plaintiffs harmed by the alleged AMPI–CMPC conspiracy. It could be inferred that their prices were also set by AMPI–CMPC. In sum the concerns underlying *Illinois Brick* (and specifically its distinct concerns about remoteness of injury) are absent here.

*McCready,* as Supreme Court authority, obviates any need to discuss the District Court and Court of Appeals cases cited by AMPI–CMPC. Nevertheless all those cases are distinguishable:

1. In *Mid-West Paper Products Co.,* two groups of plaintiffs were denied Section 4 standing:

    (a) indirect purchasers, where there was no showing (596 F.2d at 578) "they have absorbed the illegal overcharge in its entirety," and

    (b) direct purchasers from defendants' competitors, where there was no showing defendants controlled or set competitors' prices (*id.* at 583–87).

Here Oberweis has some factual predicate for its assertions (a) it has absorbed all the overcharges in its purchases from the 23 suppliers and (b) AMPI–CMPC control the 23 suppliers' prices.

2. In both *In re Folding Carton Antitrust Litigation,* 88 F.R.D. 211, 217–20 (N.D.Ill.1980) and *Liang v. Hunt,* 477 F.Supp. 891, 896 (N.D.Ill.1979), classic *Illinois Brick* situations were involved: Plaintiffs denied standing were linked only indirectly to defendants' antitrust violations.

3. After briefing was completed, AMPI–CMPC directed attention to newly-decided *California v. Standard Oil Co.,* 691 F.2d 1335 (9th Cir.1982). Even a cursory reading (at 1340–41) discloses *California* was decided on classic *Illinois*

---

**19.** Allegedly the uncontrolled Oberweis suppliers would sell at "a tad under the AMPI price." Def. Mem. 25. It remains to be seen, of course, whether at trial the difficulties of proof that led in part to rejection of a similar claim in *Mid-West Paper Products Co. v. Continental Group,*

*Inc.,* 596 F.2d 573, 583 (3d Cir.1979), can be overcome.

**20.** Oberweis tried to shift gears in this regard. Ans. Mem. 3. That effort was both untenable and unnecessary.

*Brick* facts and special problems of "speculative" damages.

 *Illinois Brick* and its progeny clearly do not bar Oberweis' recovery of damages sustained in purchases from the 23 allegedly independent suppliers of raw milk. *Illinois Brick*'s limitations do not apply to defendants who control their "independent" competitors' prices.[21]

### Conclusion

AMPI and CMPC are bound by, and may not relitigate in this action, the *Alexander* determinations identified in the Summary of the "Oberweis' Motion" section of this opinion.[22] On the other side of the coin, the AMPI–CMPC motion for "partial summary judgment" is denied in all respects.

---

21. Hence any possible issue of naming AMPI–CMPC's co-conspirators is irrelevant here. Def. R. Mem. 12–15.

22. Those determinations have minimal utility (at best) in comparison with Oberweis' total claims. Given the equally fruitless motion by AMPI–CMPC and the volume of paperwork generated by the current motions, their mountain of paper labored and brought forth a very small mouse indeed. Horace, *Ars Poetica* 1. 168. Both sides would have been better advised to expend the same efforts in advancing this decade-old action toward trial. And this Court would have been spared the writing of an inordinately long opinion.