**PHONETELE, INC., Plaintiff,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Western Electric Company, Incorporated, and Bell Telephone Laboratories, Incorporated, Defendants.**

**No. CV 74–3566–WPG.**

United States District Court,
C. D. California.

July 26, 1977.

Sigelman & Stein, Rick M. Stein, Paul S. Sigelman, Beverly Hills, Cal., for plaintiff.

Wyman, Bautzer, Rothman & Kuchel, Frank Rothman, Andrew M. White, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION

WILLIAM P. GRAY, District Judge.

Phonetele, Inc. filed this antitrust suit against American Telephone and Telegraph, Inc. (AT&T), Western Electric Co., Inc. and Bell Telephone Laboratories, Inc., charging violations of the Sherman (15 U.S.C.A. §§ 1, 2 (Supp.1977)) and Clayton (15 U.S.C. § 14 (1970)) Antitrust Acts. Phonetele alleges that the violations grew out of various tariffs that AT&T filed with the Federal Communications Commission (FCC) and which, the plaintiff contends, had the effect of impeding Phonetele's sales in the telecommunications marketplace.

Phonetele manufactures a device called a "Phonemaster," which is an electronic device designed to be linked to the national telephone network. Once attached to a telephone instrument, the Phonemaster prevents outgoing calls to telephones that are not in pre-selected area codes or exchanges. Thus, it can bar the completion of unauthorized or misdialed long distance calls, which in turn can result in considerable savings to telephone subscribers.

The essence of Phonetele's complaint is that the defendants have conspired to limit sales of the Phonemaster by restricting the manner in which the device can be "interconnected" with the national telephone system. Prior to 1968, tariffs [1] filed by AT&T with the FCC prohibited the interconnection of customer-provided equipment with the national telephone network. However, this practice was invalidated by the FCC in *Carterfone*, 13 F.C.C.2d 420, *reconsideration denied* 14 F.C.C.2d 571 (1968). Following that decision, AT&T filed a tariff [2] that permitted interconnection so long as AT&T hardware was used to form the linkage between the Phonemaster and the telephone network. The tariff also required the customer to pay AT&T an installation charge and a monthly service fee for the interconnecting equipment. This is the tariff that is challenged in this action.

The defendants respond that they are immune from antitrust liability because this aspect of the telecommunications industry is pervasively regulated by the FCC and its counterpart agencies at the state level. They argue that when Congress mandated an extensive federal regulatory system over telecommunications by passing the Communications Act of 1934 (47 U.S.C. §§ 151–609) (the "Communications Act" or the "Act"), it simultaneously effected an implicit repeal of the federal antitrust laws to the extent that they were repugnant to the regulatory program. Accordingly, the defendants have moved for judgment on the pleadings, arguing that this case should be dismissed because the regulatory scheme and the antitrust laws do not permit of mutually harmonious application. This court took the

---

1. As part of the regulatory regime established by the Communications Act of 1934, 47 U.S.C. §§ 151–609, AT&T is required to submit "schedules" to the FCC showing all charges between points on its system. (§ 203(a)). These schedules are called "tariffs." The regulatory framework established by the Communications Act is considered in Part II, *infra*.

2. Revised tariff F.C.C. No. 263, filed October 22, 1968.

matter under submission, and now grants the motion.

# I

## ANTITRUST IMMUNITY

■ The goals of regulatory laws and antitrust statutes often are in conflict. *See FCC v. RCA Communications, Inc.,* 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953). The former usually are predicated on the assumption that unrestrained interaction of competitive forces in a particular industry will disserve the public interest; while the latter are founded upon the premise that such unrestrained interaction will yield the best allocation of economic resources. 2 A. Kahn, *The Economics of Regulation: Principles and Institutions* 1, 4–5 (1971). *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 301, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). In certain instances, Congress has recognized that antitrust enforcement would clash so severely with the goals of a newly minted regulatory program that an express partial repeal of the antitrust laws has been made a part of the regulatory statute.[3] However, in some instances where Congress has not specifically provided for repeal, the Supreme Court has held that the antitrust and regulatory statutes are so mutually inconsistent that a partial repeal of the antitrust laws should be inferred to the extent necessary to vindicate the regulatory scheme. *E. g., Pan American World Airways, Inc. v. United States, supra; United States v. National Association of Securities Dealers,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975).

■ The Supreme Court has laid down some guidelines for applying the doctrine of such implied immunity. Thus, implicit repeals are "strongly disfavored," *United States v. Philadelphia National Bank,* 374 U.S. 321, 351, 83 S.Ct. 1715, 1735, 10 L.Ed.2d 915 (1963); should be found only "in cases of plain repugnancy between the antitrust and regulatory provisions," *id.;* "and then only *pro tanto* to the extent of the repugnancy." *Georgia v. Pennsylvania Railroad Co.,* 324 U.S. 439, 456, 65 S.Ct. 716, 726, 89 L.Ed. 1051 (1945). In short, repeal should be inferred only where necessary to make the regulatory program work. *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

# II

## THE REGULATORY PROGRAM

An analytical starting point for a determination of whether antitrust principles are repugnant to the FCC's regulation of the interconnection of customer-owned devices with the national telephone network ("interconnection"), is a consideration of the nature of the regulatory program established by Congress. The legislative history of the Communications Act is silent on the subject of immunity.[4] However, it indicates that the FCC is to have "comprehensive jurisdiction over the [telecommunica-

---

**3.** *E. g.,* 47 U.S.C. § 221(a) (1970) (providing that consolidations of formerly independent telephone companies, once approved by the FCC, are not subject to the antitrust laws.) Phonetele argues that this express grant of immunity in the very statute upon which AT&T relies for its implied immunity claim bespeaks a congressional intent to limit antitrust immunity in the telecommunications field to § 221(a) situations. This argument is unpersuasive. *See United States v. NASD,* 422 U.S. 694, 720, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) (where immunity was inferred under § 22(f) despite the inapplicability of the express immunity granted by § 22(d) of the Investment Company Act of 1940 (15 U.S.C. § 80a–22(d), (f) (1970)); *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 305–310, 320, 83 S.Ct. 476, 9 L.Ed.2d

325 (1963) (implied immunity applicable to transactions that could not be immunized under express immunity provision of § 414 of the Federal Aviation Act (49 U.S.C. § 1384 (1970)); *Mt. Hood Stages, Inc. v. Greyhound Corp.,* No. 74–1282, 555 F.2d 687, 691 (9th Cir. 1977) ("despite a grant of express immunity that does not cover the conduct charged, antitrust immunity may still be implied.") *See also IT&T v. General T. & E. Corp.,* 518 F.2d 913, 919 (9th Cir. 1975).

**4.** *See United States v. AT&T,* 427 F.Supp. at 60, No. 74–1698 (D.D.C.1976) (order denying motion to dismiss); Note, *AT&T and the Antitrust Laws,* 85 Yale L.J. 254, 269–70 n. 76 (1975).

tions] industry."[5] The FCC is to exercise this jurisdiction over common carriers, like AT&T, which are to make available a rapid, efficient and adequate national communications system with service pursuant to "just and reasonable" tariffs initiated by the carriers. (§ 201(b)). In addition, the Act proscribes conduct by carriers that constitutes unjust or unreasonable discrimination in providing service (§ 202), and requires them to furnish such service "upon reasonable request therefor." (§ 201(a)).

In order to effect these goals, the Act requires a common carrier to file "schedules" (tariffs) with the FCC, setting forth the manner in which the carrier plans to operate its communications service. (§ 203(a)). No carrier may engage in business unless tariffs have been filed (§ 203(c)), nor may a carrier deviate from the tariffs unless they are properly amended. (§ 203(b)(1)). The FCC may pass on the lawfulness of tariffs by holding hearings to determine whether the tariffs are "just and reasonable" (§§ 204–205) or "in violation of any of the provisions of the [Act]." (§ 205). Hearings are commenced either upon the initiative of the FCC or upon complaints filed by interested parties. (§§ 204, 208). If, after a hearing, the Commission finds that a tariff is unlawful, it may modify it. (§ 203(b)(2)).

The FCC is also obliged to keep itself informed as to "technical developments and improvements" in the telecommunications field, so that "the benefits of new inventions and developments may be made available to the people of the United States." (§ 218). Finally, the FCC is empowered to "make such rules and regulations . . . as may be necessary in the execution of its functions" (§ 154(i)), and "as may be necessary in the public interest to carry out the provisions of [the Act]." (§ 201(b)). This "public interest" compass should guide the Commission's determination of whether a carrier-initiated tariff is "just and reasonable" (§ 201(b)) and whether, pursuant to § 205, it conforms to the general policies set forth in § 151, namely, to make available a rapid and efficient telephone system.

Although competition is a relevant component of the "public interest" it is not determinative.[6] Rather, the FCC is to measure the salutary effect that competition will have upon the quality of telecommunications service provided to the public. As Justice Frankfurter stated in *FCC v. RCA Communications, Inc.,* 346 U.S. 86, 97, 73 S.Ct. 998, 1005, 97 L.Ed. 1470 (1953):

> "[T]he Commission must at least warrant, as it were, that competition would serve some beneficial purpose such as maintaining good service and improving it. . . . Merely to assume that competition is bound to be of advantage, in an industry so regulated and so largely closed as this one, is not enough."

The FCC has expressed its awareness that the antitrust goals of encouraging free competition are not necessarily in harmony with the public interest standard that must govern its regulatory function.[7]

It is within the hereinabove described statutory system that the FCC has regulated interconnections. Prior to 1968, the tariff that AT&T had on file with the FCC flatly prohibited interconnection. Tariff F.C.C. No. 132, (filed April 16, 1957), superseded by tariff F.C.C. No. 263, (filed January 2, 1968). In *Carterfone,* 13 F.C.C.2d 420, *reconsideration denied* 14 F.C.C.2d 571 (1968), the FCC determined that such tariff was unreasonable and unlawful within the terms of § 201(b), and called upon carriers to submit new tariffs that would permit interconnection but would not "adversely affect the telephone company's operations or the telephone system's utility for others."

**5.** S.Rep. No. 781, 73d Cong. 2d Sess. at 3 (1934).

**6.** *FCC v. RCA Communications, Inc.,* 346 U.S. 86, 94, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); *Hawaiian Telephone Co. v. FCC,* 122 U.S.App. D.C. 229, 498 F.2d 771, 776 (1974). *See Panel, The Role of Competition in Transportation and*

*Communications,* 39 Antitrust L.J. 465, 476–79 (1970) (remarks of FCC Commissioner Kenneth Cox).

**7.** Memorandum of FCC as *Amicus Curiae* at 12, *United States v. AT&T,* Civil No. 74–1698, 427 F.Supp. 57 (D.D.C. filed November 20, 1974) (footnote omitted).

13 F.C.C.2d at 424, 14 F.C.C.2d at 573. The carriers responded in 1968 by filing new tariffs that permitted interconnection through carrier-supplied connecting arrangements, and in conjunction with carrier testing of customer-supplied equipment. The FCC was uncertain that this method was the minimum protection required to preserve the integrity of the telephone network at the lowest cost, but "exercising an abundance of caution in protecting the telephone network from possible harm allowed the tariffs to become effective[8] without ruling explicitly on "their lawfulness." 40 Fed.Reg. 53013, 53014 (1975).

Between 1969 and 1972, the FCC conducted informal proceedings to assist in its evaluation of the public interest factors involved in liberalizing interconnection rules without compromising the efficiency of the national telephone network. The Commission issued technical research contracts to study the effects of interconnection and solicited comments from interested parties. *Id.* On June 14, 1972, the FCC instituted a Proposed Rule-Making aimed at determining the best approach to interconnection. 35 F.C.C.2d 539 (1972). These proceedings remained active during 1973 and 1974 when comments were solicited about various proposals for systematic regulation of interconnection. 40 F.C.C.2d 315 (1973). On November 14, 1975, after giving full and complete consideration to many suggested regulatory programs, the FCC proposed a "Registration Program" for customer-owned equipment. 40 Fed.Reg. 53013 (1975) (codi-

fied in 47 C.F.R. § 68 (1976)). Basically the program allows users to interconnect their equipment if it is attached through protective circuitry registered with the FCC or if the equipment itself is so registered. The FCC will not register a device that it concludes will present potential harm to the overall quality or safety of the national telephone network. Non-registered equipment may be attached with telephone company interface devices. The Commission's program was recently upheld by the Fourth Circuit. *North Carolina Utilities Commission v. FCC,* 522 F.2d 1036 (4th Cir. 1977).

## III

## APPLICATION OF ANTITRUST IMMUNITY THEORY

█ It appears evident from the foregoing that if the federal antitrust laws are applied to the interconnection of customer-owned telecommunications devices, the sophisticated regulatory program of the FCC will not work. These two statutory concepts are sufficiently mutually repugnant to compel the inference that Congress intended to repeal the antitrust laws otherwise applicable to the area of interconnection.[9]

█ This conclusion is consistent with prior Supreme Court decisions about implied immunity, because four factors that the Court found relevant in those cases are present here.[10] First, the acts charged in this civil suit as antitrust violations involve

---

8. *AT&T "Foreign Attachment" Tariff Revisions,* 15 F.C.C.2d 605 (1968), *reconsideration denied,* 18 F.C.C.2d 871 (1969).

9. Phonetele's argument that defendants Western Electric and Bell Laboratories are not companies subject to the regulation of the FCC, and therefore should not be relieved under a theory of implied immunity, is not persuasive. These two defendants are accused of conspiring with AT&T within the highly regulated telecommunications sphere, and therefore are not charged with any acts that can escape FCC regulation. *Cf. Gordon v. N.Y.S.E.,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), where the Court concluded that pervasive SEC regulation of commission rates charged by the New York and American Stock Exchanges warranted implied antitrust immunity for the

regulated Exchanges *and* for two of their member firms who were also defendants. The SEC supervision that the Court found determinative regulated the Exchanges and not their member firms.

Moreover, the FCC has significant regulatory power over the vertical relationship of regulated firms. *See* 47 U.S.C. § 215 (1970), which gives the FCC the authority to inquire into the transactions of regulated common carriers with non-regulated entities that are likely to affect adversely the carrier's ability to render adequate service to the public at reasonable cost.

10. For a comprehensive consideration of these factors, *see* Note, *AT&T and the Antitrust Laws,* 85 Yale L.J. 254 (1975).

the "precise ingredients" of the regulatory authority vested in the FCC. *See Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 305, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). As the earlier discussion in this memorandum shows, Sections 201–218 of the Communications Act mandate that the Commission regularly monitor tariffs and terminate unlawful ones. The promulgation and implementation of tariffs is the principal conduct about which Phonetele complains.[11] Moreover, the previously described Registration Program (47 C.F.R. § 68 (1976)), shows that the Commission has maintained tight control over interconnection.[12]

Second, like the regulatory agencies involved in *Pan American,* 371 U.S. at 311–12, 83 S.Ct. 476, and *United States v. National Association of Securities Dealers,* 422 U.S. 694, 734, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975), the FCC has authority to grant the relief sought in the complaint. Since the Commission can issue cease and desist orders (§ 205(a)) and modify carrier-initiated tariffs (§ 203(b)(2)), it can provide the injunctive relief that Phonetele desires. Pursuant to Sections 206–209 of the Act, the FCC can also award damages to Phonetele. *See Western States Telephone Co. v. American Telephone and Telegraph Co.,* 19 F.C.

C.2d 1068 (1969). *See also Booth v. American Telephone and Telegraph Co.,* 253 F.2d 57, 58 (7th Cir. 1958). And assuming, *arguendo,* that Phonetele has standing to seek a rebate for one of its customers, it may apply for such relief from the FCC. (§ 204(a)).

■ Third, competition is a component of the public interest standard that guides the Commission's regulation of interconnection.[13] The Court's decisions in *Pan American, Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), and *United States v. National Association of Securities Dealers,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) indicate that implied immunity is logical when, in formulating its regulatory policy, the agency includes a consideration of the beneficial purposes of preserving competition.

Fourth, the FCC has considerable expertise in the field of interconnection, to which courts have deferred, *e. g., Carter v. American Telephone and Telegraph Co.,* 365 F.2d 486 (5th Cir. 1966), *cert. denied,* 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). The Supreme Court has suggested that agency expertise supports a finding of implied immunity. *Gordon,* 422 U.S. at 689–

---

**11.** The recently decided case of *Mt. Hood Stages, Inc. v. Greyhound Corp.,* No. 74–1282, 555 F.2d 687 (9th Cir. 1977) is not to the contrary. There the Interstate Commerce Commission (ICC), applying a "public interest" standard (49 U.S.C. § 5(2)), approved Greyhound's acquisition of four bus companies whose routes encircled those of Mt. Hood Stages. However, the ICC had predicated its approval of the acquisitions upon Greyhound's pledge to continue to book its through-passengers on Mt. Hood Stages' lines whenever that would provide the most direct route. When Greyhound reneged on this promise, Mt. Hood Stages instituted an antitrust action and secured a judgment on a jury verdict. On appeal Greyhound pursued unsuccessfully a claim of implied antitrust immunity.

The court reasoned that the ICC had not authorized Greyhound's challenged actions when it approved the acquisitions, and in fact, was assured that such conduct would not occur. Thus, the antitrust case did not overlap the "precise ingredients" of any regulatory proceedings. In the present action, AT&T is not accused of similar attempts to subvert the

FCC's determined effort to supervise interconnection. Instead, AT&T is charged with misconduct in the issuance of tariffs, an area at the center of the Commission's regulatory jurisdiction. Accordingly, the application of the antitrust laws here would intrude into the domain of the FCC, a result not required by *Mt. Hood Stages.*

**12.** Phonetele's contention that some of the defendants' alleged misconduct is within the exclusive jurisdiction of state regulatory agencies, and thus escapes the FCC's supervisory authority, is not persuasive. State supervision over significant issues that relate to the interconnection of customer-provided equipment has been preempted by FCC regulation. *North Carolina Utilities Commission v. FCC,* 537 F.2d 787 (4th Cir.), *cert. denied* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976). Thus, it is extremely doubtful that any substantial misconduct in this field will elude the regulatory net cast by the FCC.

**13.** See n. 6, *supra.*

**214**

90, 95 S.Ct. 2598. In light of the complex electrical engineering questions presented by interconnection, inferred antitrust immunity, and thus deference to the FCC, are reasonable. This will prevent the application of conflicting statutory standards to the defendants and will thereby protect the integrity of the regulatory program that Congress established in the Communications Act. To hold otherwise would be to sanction the collision of the policies of the Antitrust and Communications Acts, a result that plainly would disserve the goals of both.

In reaching this conclusion, it is heartening to note that my brother Judge Lydick rendered a similar decision involving another device that is interconnected to the national telephone network. *DASA Corporation v. General Telephone Co. of California*, No. CV 73–2511–LTL (C.D.Cal. May 10, 1977).

For the reasons hereinabove set forth the defendants' motion is granted.