**SELECTRON, INC.; Longford Interconnect Tel. Co.; Interconnect Northwest; American Business Comms., Inc., Redd Corp., Plaintiffs,**

**v.**

**AMERICAN TEL. & TEL. CO.; Pacific Northwest Bell Inc.; Western Electric Co., Inc.; Bell Tel. Labs., Inc., Defendants.**

Civ. Nos. 76–965–BE, 83–1261 and 74–987.

United States District Court, D. Oregon.

June 4, 1984.

Thomas J. Greenan, Christopher Kane, James E. Hurt, Ferguson & Burdell, Seattle, Wash., Edwin B. Spievack, Washington, D.C., Bruce M. Hall, Duane A. Bartsch, Portland, Or., Henry Kane, Beaverton, Or., for plaintiffs.

Barnes H. Ellis, Gregory R. Mowe, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., Harvey Kurzweil, Scott M. Univer, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Lloyd G. Hammel, Jr., Seattle, Wash., for defendants.

## OPINION AND ORDER

BELLONI, District Judge.

### Introduction

This case is a consolidation of three antitrust actions brought against American Telephone and Telegraph Company; Pacific Northwest Bell, Inc.; Western Electric Company, Inc.; and Bell Telephone Laboratories Inc. (Hereinafter AT & T).[1] Plaintiffs compete with AT & T in Oregon and Washington in the terminal telephone equipment market. This market consists of the sale and lease of PBX and key telephone systems.[2] Plaintiffs allege that,

---

1. The original *Selectron* case was filed in 1976. Following the ruling in *Phonotele v. AT & T,* 435 F.Supp. 207 (C.D.Cal.1977), this court dismissed *Selectron* on the grounds that (1) the FCC had exclusive jurisdiction and (2) the Federal Communications Act conferred an implied antitrust immunity. The Ninth Circuit Court of Appeals reversed both cases for reasons stated in *Phonotele Inc. v. AT & T,* 664 F.2d 716 (1981).

2. Business offices typically employ one or both of these systems. The chief characteristic of the key system is that it enables the user of one phone to connect communications to several other individual telephones by pressing buttons on the base of the phone. A PBX system is similar but operates on a larger scale. A PBX system employs a central console that allows

among other things, AT & T monopolized the terminal equipment market in violation of section two of the Sherman Act, 15 U.S.C. § 2.

Before me is plaintiff's motion for partial summary judgment to preclude relitigation of certain issues decided adversely to AT & T in *Litton Systems, Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785 (2d Cir.1983). Plaintiffs contend that AT & T fully and fairly litigated these issues in *Litton* and should not have a second opportunity to do so in this action.

*Background*

The *Litton* and *Selectron* complaints arise from a series of events beginning at least as far back as the FCC ruling in *Use of the Carterfone Device in Message Toll Telephone Service*, 13 F.C.C.2d 420, *recon. denied*, 14 F.C.C.2d 571 (1968). (*Carterfone*). In *Carterfone*, the FCC struck down an AT & T tariff that prohibited the interconnection of subscriber-owned equipment to the AT & T telephone network. The FCC ruled that the tariff was unjust and unreasonable because it prohibited the interconnection of "harmless as well as harmful" equipment. *Carterfone*, 13 F.C.C.2d at 423, 424. The FCC invited AT & T to submit new tariffs to replace the ones the FCC found discriminatory. Although the FCC provided AT & T with little guidance as to what should be included in the new tariffs, the FCC did state that AT & T "may specify technical standards if [it wishes]." *Carterfone*, 13 F.C.C.2d at 426.

The new tariffs that AT & T filed as a result of *Carterfone* allowed the interconnection of subscriber-owned equipment but only with the use of a plate-like connecting device called a "protective connecting arrangement" or PCA.[3] Under the terms of the tariffs, AT & T was to provide, install, and maintain the PCA device at the customer's expense. The FCC accepted the PCA tariffs but withheld specific approval.[4]

*Carterfone*, at least in theory, gave telephone subscribers the freedom to obtain their telephone equipment from suppliers of their choice. The PCA tariff operated to reduce this freedom and had the effect of "minimizing the impact of *Carterfone*." *International Tel. & Tel. Corp. v. General Tel. & Elec. Corp.*, 518 F.2d 913, 933 (9th Cir.1975).

After acceptance of the PCA tariffs, the FCC began an investigation into their merits. While investigations were being conducted, AT & T's competitors were fighting to repeal the tariffs. The competitors contended that like the pre-*Carterfone* tariffs, the PCA tariffs restricted "harmless as well as harmful" terminal equipment. The competitors asserted that the AT & T telephone system could be protected without the PCA device by requiring that subscriber-owned equipment meet certain technical standards. They contended that a technical standards certification program would not have the competitive disadvantages associated with the PCA requirement. AT & T vigorously opposed the certification program maintaining that such a program would not adequately protect the AT & T telephone system.

The FCC's investigations culminated in a series of reports. *See Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Service (WATS)* —First and Second Report and Order, 56 F.C.C.2d 593 (1975); 58 F.C.C.2d 736 (1976). (The latter report relates to PBX and key systems.) In these reports the FCC concluded that the PCA tariffs

the user to switch communications to as many as several thousand individual telephones.

3. The PCA device was to serve as a 'network control signaling' device to prevent wrong numbers, false busy signals, and incorrect billings and as a 'connecting arrangement' to enable the connection of private equipment to the AT & T telephone network.

4. In footnote 39 and the associated text of *United States v. AT & T*, 461 F.Supp. 1314, 1327 (D.D.C.1978), the court explained the FCC's view of accepting a tariff with and without approval. Since tariffs often become effective without the Commission's "scrutiny or approval, the courts appropriately exercise antitrust jurisdiction.... The Commission considers, however, that when it has prescribed or specifically approved a tariff, its judgment must control..."

were unreasonable and unduly discriminatory. *First Report and Order*, at 598. As a consequence, the FCC replaced the PCA tariffs with a technical certification program as recommended earlier by AT & T's competitors. *See* 47 C.F.R. §§ 68.100–.506 (1980). The FCC continued to require the PCA device for terminal equipment not meeting the certification standards.

It was in light of this history that Litton brought its case against AT & T. Litton alleged that AT & T monopolized the terminal equipment market in violation of sections one and two of the Sherman Act, 15 U.S.C. §§ 1 and 2.[5]

The *Litton* case was vigorously prosecuted and defended.[6] At the conclusion of trial, the jury found that AT & T monopolized the terminal equipment market; that AT & T committed various anticompetitive acts;[7] and that as a result, Litton sustained injuries in the amount of $91,900,000 as a competitor and $268,243 as a customer of AT & T. 525 F.Supp. 154 (S.D.N.Y. 1981). These amounts were, of course, trebled. The court denied AT & T's motion for judgment notwithstanding the verdict and for a new trial. 525 F.Supp. 154 (S.D. N.Y.1981). The Second Circuit Court of Appeals unanimously affirmed. 700 F.2d 785 (1983). On March 31, 1983, AT & T's requests for rehearing and rehearing en banc were denied. The Supreme Court subsequently denied AT & T's request for certiorari. —— U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

As a result of *Litton*, the Selectron plaintiffs, and similarly situated plaintiffs in cases in other jurisdictions, moved for partial summary judgment to foreclose relitigation of issues determined by the *Litton* jury. Two courts have thus far decided

motions for partial summary judgment against AT & T.

The first court to decide the motion was the Federal District Court of the District of Columbia in *Jack Faucett Assoc. v. AT & T*, 566 F.Supp. 296 (1983). *Faucett* involved a consolidation of five class action antitrust cases. The plaintiffs were seven businesses that were required to purchase and use PCA devices for the terminal telephone equipment they obtained from non-AT & T suppliers. The trial court in *Faucett* ruled in plaintiff's favor holding that AT & T should be foreclosed from relitigating issues concerning the relevant market; AT & T's monopolization of that market; and AT & T's perpetration of such predatory acts as filing the PCA tariffs in bad faith and opposing the certification program in bad faith. 566 F.Supp. at 301.

The second case in which this issue was decided was *Phonotele, Inc. v. AT & T*, Civ. 74–3566 (C.D.Cal. Jan. 19, 1984). Unlike in *Faucett*, in *Phonotele* the court denied plaintiff's motion to foreclose the relitigation of issues determined in *Litton*. The reason for the court's denial of the motion was, in part, because the product market in *Litton* differed from the product market in *Phonotele*. Phonotele made and distributed the Phonemaster. The Phonemaster was used in conjunction with PBX and key system equipment for recording messages and diverting calls. Unlike Litton, Phonotele did not sell or lease PBX or key system equipment.

■ In the instant action, I grant in part and deny in part plaintiff's motion for partial summary judgment to preclude the relitigation of issues determined in *Litton*. Unlike the product market in *Phonotele*,

---

**5.** Litton's claims of monopolization and anticompetitive conduct were, for the most part, identical to those claims set forth in the *Selectron* complaint.

**6.** Pretrial proceedings consumed four and a half years. Trial lasted five months and generated 18,000 pages of testimony and 945 exhibits. Plaintiffs allege that AT & T spent $65,000,000 in defense.

**7.** In a special verdict the *Litton* jury found that AT & T possessed monopoly power in the terminal telephone equipment market; AT & T had specific intent to obtain and attempted to obtain such monopoly power; and that AT & T filed the interface tariffs in bad faith, opposed certification in bad faith, intentionally delayed the installation of PCA devices, refused to sell inside wiring in bad faith, and delayed making cutovers in bad faith.

the product market in *Selectron* is identical to the one in Litton. The parties do not contend otherwise. AT & T fully and fairly litigated its case in *Litton.* The *Litton* trial court fully grasped the issues in that case. In fact, the Second Circuit went so far as to describe the trial court's handling of *Litton* as "a model of judicial technique for handling a serious, complex, and difficult jury trial." 700 F.2d 785, 790. In the following discussion I elaborate on the reasons for my decision.

## Discussion

### The Collateral Estoppel Doctrine

The purpose of the collateral estoppel doctrine is to save judicial and adversarial resources. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). In the last few years several courts have applied the doctrine offensively to preclude the relitigation of issues in major antitrust cases. *See GAF Corp. v. Eastman Kodak Co.,* 519 F.Supp. 1203 (S.D.N.Y.1981); *Argus Inc. v. Eastman Kodak Co.,* 552 F.Supp. 589 (S.D.N.Y.1982); *Oberweis Dairy v. Associated Milk Producers Inc.,* 553 F.Supp. 962 (N.D.Ill.1982); *Jack Faucett Assoc. v. AT & T,* 566 F.Supp. 296 (D.D.C.1983).

■■■ Application of the doctrine is not a matter of right but rather a matter in which the trial judge has broad discretion. *See Parklane Hosiery Co.,* 439 U.S. at 331, 99 S.Ct. at 651. In exercising this discretion the trial judge must consider the following prerequisites:

1. The party to be estopped must have been a party or in privity with a party to the prior action;

2. The issues to be estopped must be identical to issues actually litigated and finally determined;

3. The issues to be estopped must have been necessary to the prior judgment;

4. The party to be estopped must have had a full and fair opportunity to litigate the issues in the prior action; and

5. Application of the doctrine must not otherwise be unfair.

*See Parklane Hosiery Co., supra; Blonder-Tongue Laboratories Inc. v. University of Ill. Found.,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); Restatement (Second) of Judgments §§ 27–29 (1982).

AT & T argues that several of the above prerequisites have not been met especially the fifth one concerning unfairness. In *Parklane* and *Blonder-Tongue* the Supreme Court recognized several instances in which it would be unfair to apply the doctrine. Among the instances mentioned were where: (a) judgments inconsistent with the prior judgment exist; (b) the prior judgment was based upon improper legal standards; (c) the party against whom the doctrine is asserted was, without fault of its own, deprived of crucial evidence in the prior action and; (d) there was a lack of incentive to litigate in the prior action.[8] *See also* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4465. In addition, the Court held that collateral estoppel should be rejected where the party seeking to apply the doctrine could have easily joined in the prior action but instead chose to take a "wait and see" approach on the sidelines.[9] *Parklane,* 439 U.S. at 330, 99 S.Ct. at 651.

### 1. Identity of Parties

Defendants in the instant action were parties in the *Litton* case. AT & T does not contend to the contrary. Thus the first prerequisite for application of the doctrine is fulfilled.

### 2. Identity of Issues

■■■ Monopoly power is the power "to control prices or exclude competition" in a relevant market. *U.S. v. Grinnell,* 384

---

**8.** It is evident that AT & T had every incentive to vigorously litigate its case in *Litton* and did so. This issue is not contested.

**9.** AT & T does not contest this issue. I find that the *Selectron* plaintiffs did not take a 'wait and

see' approach in the instant action. If *Selectron* had not been subjected to appellate proceedings, it may have been tried prior to *Litton. See* note 11, supra.

U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). A relevant market is defined in terms of both a product and a geographic market. *Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 667 (9th Cir.1963), *cert. denied* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). In *Litton,* the jury found that AT & T possessed monopoly power in the terminal equipment product market. AT & T does not contend that this product market differs from the product market in *Selectron.* AT & T does, however, contend that there is a difference in geographic markets. This difference, AT & T asserts, changes the focus of its state action defense in each case and makes issue preclusion inappropriate.

The state action defense that AT & T refers to provides regulated entities with an opportunity to show that their alleged anti-competitive conduct was justified in light of existing federal and state regulatory policies. In this regard, Professors Areeda and Turner state:

> [A]ntitrust courts can and do consider the particular circumstances of an industry and therefore adjust their usual rules to the existence, extent, and nature of regulation. Just as the administrative agency must consider the competitive premises of the antitrust laws, the antitrust court must consider the peculiarities of an industry as recognized in a regulatory statute.

1 P. Areeda & D. Turner, Antitrust Law § 223d (1978); *See also ITT v. General Tel.*

*and Elec.*, 518 F.2d 913, 935–36 (9th Cir. 1975). The Ninth Circuit Court of Appeals recognized the validity of this defense in its order reversing and remanding the trial court's earlier dismissal of *Selectron.*[10] The Ninth Circuit specifically stated that its order "was without prejudice to the defendants renewing their state action defense." CV 76–965 (9th Cir. Sept. 16, 1982).

AT & T admits that it litigated its state action defense in *Litton* but explains that because of the differing geographic markets in *Litton* and *Selectron* the results of that litigation cannot be applied to the instant action. The geographic market in *Litton,* AT & T contends, was national in scope whereas in *Selectron* the geographic market is limited to the states of Oregon and Washington. AT & T argues that the national scope of the *Litton* trial prevented AT & T from focusing its state action defense upon Oregon and Washington. AT & T contends that collaterally estopping the monopoly power issue in the instant action would improperly deprive AT & T of the opportunity to litigate their state action defense with respect to these states.

AT & T's argument is without merit. In accordance with the Ninth Circuit's order in *Selectron,* AT & T was given a full opportunity to try its state action defense in *Litton.* AT & T presented testimony, exhibits, and arguments on this issue.[11] In addition, Judge Connor made express reference to this defense in his instructions.[12]

---

**10.** See footnote 1, supra.

**11.** Some of AT & T's evidence on this issue related directly to Oregon and Washington state regulatory policies. AT & T not only cross-examined Selectron's president on this issue in the *Litton* trial but in addition, entered into evidence several Oregon Public Utility Commission decisions. *Litton* Exhibits DX 572–1, 572–3, 572–6.

**12.** Judge Connor made several references to AT & T's state action defense in his instructions. Among those references include the following:

> In determining whether defendants had monopoly power in the relevant market...one factor, among others, for you to consider is the extent of government regulation of certain activities of AT & T and the Bell operating companies, including the fact that these companies submit tariffs to certain regulatory agencies, including the FCC in connection with various aspects of their telecommunication business. The fact that such regulation exists does not by itself mean that defendants did not possess monopoly power. It is for you to determine the practical effect of such regulation upon Bell's asserted ability to control prices and exclude competition.
>
> Bell contends that this government regulation effectively precluded them from possessing the power to control prices or exclude competition. Litton contends that this regulation has no significant impact upon Bell's ability to control prices and exclude competition. You should consider these contentions and the evidence you have seen and heard

The fact that AT & T did not concentrate exclusively upon Oregon and Washington regulatory policies in presenting its defense does not reduce the integrity of the jury's determination with respect to these states. The problem is analogous to the one faced by the court in *Oberweis Dairy v. Associated Milk Producers,* 553 F.Supp. 962 (N.D.Ill.1982). In that case the geographic market in the first action involved the entire midwest whereas the geographic market in the subsequent action involved only the city of Chicago. As in the instant action, the defendants in *Oberweis* contended that the determination of monopoly power in the prior action could not be given collateral estoppel effect because the geographic market in that action was significantly larger than the one in *Oberweis.* The court rejected defendant's argument holding that "[i]t is irrelevant that the geographic areas of the two actions differ.... What controls is that [the market in the prior action] *included* this action's relevant area." *Oberweis,* 553 F.Supp. at 969 (emphasis in original). Using the same reasoning in *Selectron,* I find that AT & T's litigation of its state action defense in *Litton* on a national level is sufficient to bar relitigation of that defense in *Selectron* with respect to Oregon and Washington.

AT & T next argues that preclusion of the monopoly power issue would be inappropriate because while national competitors like Litton were harmed by AT & T's conduct, regional competitors like Selectron benefitted. AT & T provides no support for this argument. AT & T does refer this court to testimony within the *Litton* transcript; however, that testimony indicates only that national competitors suffered to a greater degree than regional competitors. Contrary to AT & T's contention, the testimony does not indicate that regional competitors benefitted from AT & T's practices.

regarding government regulation as a fact in determining whether the defendants had monopoly power.
*Litton* Transcript at 18023–18024

### 3. Necessity of Issues to the Prior Judgment

The third prerequisite for application of the doctrine is that the issue to be estopped must have been necessary to the judgment in the prior action. *Parklane Hosiery Co.,* 439 U.S. at 326 n. 5, 99 S.Ct. at 649 n. 5; *See also American Triticale, Inc. v. NYT-CO Services, Inc.,* 664 F.2d 1136, 1147 (9th Cir.1981). Issues decided unnecessarily are deprived of some of the "assurances of integrity and correctness the judicial process affords to genuinely dispositive issues." 1B Moores Federal Practice ¶ 0.443[5] (2d ed. 1983).

AT & T contends that three of the jury findings [13] were unnecessary to the *Litton* judgment because of the manner in which the jury decided them. After eight days of deliberation, the jury returned with a verdict for Litton. The jury answered all but three questions. Judge Connor resubmitted these questions to the jury for further deliberation. The jury returned thirty minutes later finding for Litton on each of the three questions, but leaving the amount of the verdict unchanged. On appeal, the Second Circuit affirmed the resubmission. 700 F.2d at 803, 804. AT & T argues that because the jury answered the instructions without changing the amount of the verdict the determination of those issues was not essential to the judgment in *Litton* and cannot, therefore, be given collateral estoppel effect.

Contrary to AT & T's argument I find that these three issues were as necessary to the judgment as the other issues. The fact that the jury returned prematurely without deciding these issues is irrelevant. Upon proper resubmission of the issues, the jury decided them. These findings provided alternative grounds for support of the judgment. It is a well recognized rule that "an alternative ground upon which a decision is based should be regarded as

13. The three jury findings included (1) AT & T's attempted monopolization proximately caused plaintiff's injury; (2) AT & T filed the interface tariffs in bad faith; and (3) AT & T delayed in making equipment cutovers in bad faith.

'necessary' for purposes of determining whether [a party] is precluded by the principles of *res judicata* or collateral estoppel from relitigating in a subsequent lawsuit any of those alternative grounds." *Winters v. Lavine*, 574 F.2d 46, 67 (2d Cir. 1978); *See also Jack Faucett Assoc.*, 566 F.Supp. at 299 n. 3.

AT & T next asserts that collateral estoppel would be inappropriate because these three determinations were the result of a jury compromise.[14] AT & T presents no evidence to show this court that the jury verdict was a compromise except for the relatively short interval in which these issues were decided upon resubmission. I find this circumstantial evidence inadequate to base a finding of a jury compromise and therefore reject defendant's argument.

4. Unfairness

Granting collateral estoppel would be inappropriate where to do so would result in unfairness to the party being estopped. As mentioned earlier, the Supreme Court in *Parklane* and *Blonder-Tongue* found that such unfairness could occur where there exist one or more prior inconsistent judgments; where the court in the prior action applied improper legal standards; and where a party, without fault of its own, was deprived of crucial evidence in the prior action.

A. The Noerr-Pennington doctrine—erroneous application

AT & T asserts that collateral estoppel of the jury finding that AT & T opposed certification in bad faith would inappropriately foreclose relitigation of its Noerr-Pennington defense. AT & T argues that relitigation of the Noerr-Pennington defense is necessary because the *Litton* trial court's application of the doctrine was in error.

■ The Noerr-Pennington doctrine is a judicially created exception to the Sherman Act. The doctrine provides antitrust immunity to a party's bona fide attempts to influence legislative, executive, administrative or judicial actions. *See Eastern R. Conf. v. Noerr Motors*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). When attempting to influence a governmental decision, a party's anticompetitive intent does not make an otherwise legitimate attempt illegal. *Noerr Motors*, 365 U.S. at 138, 139, 81 S.Ct. at 530.

The Noerr-Pennington doctrine was created to protect an interested party's participation in our representative form of government. In addition, the doctrine was formed to prevent erosion of the First Amendment right to petition the government. *California Transport*, 404 U.S. at 510–511, 92 S.Ct. at 611–612. Although the doctrine is a cogent defender of these principles, it has its limits. In *Noerr Motors*, 365 U.S. 127 at 144, 81 S.Ct. at 533, the Supreme Court held that where a party's attempt to influence government action is in reality only an attempt to directly interfere with a competitor the conduct falls within the sham exception to the doctrine.

Determining whether a party's attempt to influence the government process was genuine and therefore protected under the doctrine, or was a sham and therefore unprotected, has proven troublesome for courts. The analysis of the sham exception has been described as both imprecise[15] and difficult to employ.[16] Subsequent applications of the doctrine have helped to identify certain types of conduct that suggest a

---

**14.** The Restatement (Second) Judgments, § 29(5) and comment (g) (1982), warns against giving collateral estoppel effect to an issue which was determined as a result of a jury compromise in the prior action. This would have the effect of extending an imperfection in the first trial to the Second.

**15.** *See In re Airport Car Rental Antitrust Litigation*, 693 F.2d 84, 86 (9th Cir.1982).

**16.** *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. at 513, 92 S.Ct. at 613; *Litton Systems Inc. v. AT & T Co.*, 700 F.2d at 807; *United States v. AT & T Co.*, 524 F.Supp. 1336 (D.D.C.1981).

party is abusing the administrative process in an attempt to stifle competition. For instance, in *California Transport*, 404 U.S. at 513, 92 S.Ct. at 613, the Court found abusive conduct exists where a party files repetitive and baseless claims against another party in an attempt to intentionally bar that party's access to an administrative agency.[17]

AT & T argues that the court in *Litton* improperly instructed the jury on this matter. However, a review of Judge Connor's instructions in *Litton* indicates that his recitation of the sham exception is in accord with the state of the law on this topic. In instructing the jury, Judge Connor stated:

> [T]here is an exception to the general rule that efforts to influence public officials do not violate the antitrust laws, and that is the so-called sham or bad faith exception. If a campaign, ostensibly directed toward influencing government action, is a mere sham or artifice to cover what is essentially nothing more than an attempt to smother competition by a pattern of knowingly filing baseless claims or making misrepresentations to administrative agencies in a way designed to deprive competitors of meaningful access to those agencies, the First Amendment protections are lost and the Sherman Act applies. In considering whether Bell's filing of tariffs or opposition to registration constituted willful maintenance of monopoly power, therefore, you must decide whether or not they fall within the bad faith exception as I have just explained it to you.

*Litton* Transcript at 18037. Because I find that the *Litton* trial court properly in-

structed the jury in this matter, I reject AT & T's argument.[18]

AT & T next argues that precluding the relitigation of the Noerr-Pennington doctrine would be improper because application of the doctrine is primarily a question of law.[19] The Ninth Circuit Court of Appeals neatly disposes of this argument in *Clipper Exxpress* by stating that "[w]hether something is a genuine effort to influence governmental action, or a mere sham, is a question of fact." *Clipper Exxpress v. Rocky Mountain Motor Tariff*, 674 F.2d 1252, 1264 (9th Cir.1982).

### B. The Noerr-Pennington doctrine—inconsistent judgments

AT & T next argues that precluding relitigation of the Noerr-Pennington doctrine would be unfair because the *Litton* jury findings are inconsistent with judgments in *United States v. American Tel. & Tel. Co.*, 524 F.Supp. 1336 (D.D.C.1981); and *Southern Pac. Com. Co. v. American Tel. & Tel.*, 556 F.Supp. 825 (D.D.C.1983).

In *U.S. v. AT & T*, the government brought an action against AT & T alleging that AT & T monopolized the telecommunications market in violation of section two of the Sherman Act, 15 U.S.C. § 2. The case settled during trial shortly after the government presented its case in chief.[20] Just prior to settlement, AT & T moved to dismiss under Fed.R.Civ.P. 41(b) contending that the government presented insufficient evidence to support a verdict. In an interlocutory opinion, Judge Greene ruled against AT & T. In this opinion Judge Greene reviewed AT & T's Noerr-Pennington defense and determined that the defense protected certain evidence concerning

---

**17.** *See also Clipper Exxpress v. Rocky Mountain Motor Tariff*, 674 F.2d 1252 (9th Cir.1982); *Franchise Realty, Etc. v. S.F. Local Joint Executive Bd.*, 542 F.2d 1076 (9th Cir.1977).

**18.** *Litton's* application of the doctrine is in accord with the Ninth Circuit's position on this matter. If anything, the Ninth Circuit interprets the sham exception more broadly than other circuits. *See Clipper Exxpress*, supra; *See also In re Airport Car Rental*, 693 F.2d 84 at 86 n. 3; *Litton Systems*, 700 F.2d at 811, fn. 38.

**19.** See *United States v. Anaconda Co.*, 445 F.Supp. 486 (D.D.C.1977); *Cf. Carr v. District of Columbia*, 646 F.2d 599 (D.D.C.1980) ("It is today well accepted that issue preclusion applies to questions of law and law application as well as to questions of fact.").

**20.** The settlement resulted in the familiar 'AT & T' breakup.

AT & T's opposition to certification. AT & T argues that this determination is contrary to the *Litton* judgment.

AT & T's argument is unpersuasive. Judge Greene's opinion can not be considered inconsistent with the *Litton* jury's decision with respect to the Noerr-Pennington doctrine for two reasons. First, the opinion denying AT & T's motion to dismiss was tentative. In his comments preceding the opinion, Judge Greene states that this "is a tentative and inconclusive ruling on the quantum of plaintiff's proof, which does not preclude a court from making findings and conclusions at the close of the case that are inconsistent with [this] ruling." 524 F.Supp. at 1343. Second, Judge Greene's opinion was based upon an incomplete record. Judge Greene did not have significant portions of evidence on the Noerr-Pennington issue that were introduced in *Litton*.[21] Because Judge Greene's comments were based on an incomplete record and admittedly tentative, I do not accord them sufficient weight to preclude application of collateral estoppel in the instant action.

AT & T also contends that the *Litton* judgment is inconsistent with a finding by Judge Richey in *Southern Pac. Com. Co. v. American Tel. & Tel.*, supra. In that case, Judge Richey found that a speech given by former AT & T chairman John deButts, before the FCC announcing AT & T's opposition to certification, was protected by the Noerr-Pennington defense. AT & T contends that, contrary to Judge Richey's decision in *Southern Pac. Com. Co.*, the *Litton* court did not find that John deButts' speech came within the umbrella of the Noerr-Pennington defense. For support, AT & T refers this court to the following statement in *Litton:*

> There was also evidence tending to indicate that AT & T affirmatively misled the FCC .... For example, while it opposed certification standards pursuant to

the policy announced before NARUC in the deButts speech, AT & T provided the FCC with a study that its own author believed did not prove anything.

700 F.2d at 811. The Second Circuit's statement suggests only that affirmative misrepresentations made by AT & T employees "pursuant to the policy ... in the deButts speech" were within the sham exception. The statement does not indicate that the deButts speech itself fell within the exception. Contrary to the AT & T assertion, I find no inconsistency between *Litton* and *Southern Pac. Com. Co.*

C. The PCA Tariff—inconsistent judgments

The *Litton* jury found that AT & T filed its PCA tariff in bad faith. AT & T contends that this finding is inconsistent with FCC decisions, state regulatory agency decisions, and a National Academy of Sciences report that concluded that the PCA tariff provided a legitimate means of protecting the telephone system.

The FCC and State Regulatory Decisions

AT & T first draws the court's attention to five FCC decisions that hold that AT & T's filing of the PCA tariff did not violate the FCC mandate in *Carterfone* which proscribed tariffs that restricted the interconnection of "harmless as well as harmful" equipment. Unlike AT & T, I do not find the FCC decisions to be inconsistent judgments. First, in each case, the FCC's analysis was based only upon technical considerations. Unlike the jury in *Litton*, the FCC was not determining whether for purposes of antitrust liability the tariff conflicted with the *Carterfone* mandate. Second, the FCC determinations were not inconsistent "judgments" as contemplated by the rule in *Parklane Hosiery*. The FCC decisions were not a result of adversarial proceedings with cross-examination and the other accouterments of trial.[22]

---

21. For instance, the government did not introduce testimony of the Chairman of the PBX Advisory Committee indicating intentional delay in the development of a certification program.

22. The Court notes that AT & T used these decisions throughout the *Litton* trial in an unsuccessful attempt to convince the jury that its tariff was not filed in bad faith. These decisions were used in examining witnesses, marked

AT & T offers the same arguments with respect to various state regulatory decisions. For the reasons advanced above, I reject these arguments.

### The National Academy of Sciences Report

After adopting the PCA tariffs, the FCC initiated studies to determine their validity. In doing so the FCC hired certain consulting firms. A report from one consulting firm, Dittbeiner Associates, was entered into evidence during *Litton*. That report recommended the technical standards certification program over the PCA tariffs. Another report from the National Academy of Sciences (NAS) concluded that the network could be adequately protected by either the PCA tariff or the certification program. AT & T asserts that the NAS conclusion contradicts the *Litton* finding that the tariff was filed in bad faith. AT & T admits that the NAS report is not a "judgment" but contends that it should be afforded particular significance since it represents the determination of an expert fact-finding body.

Like the FCC and state regulatory agencies discussed above, the NAS panel did not base its decision on economic and competitive concerns under principles of antitrust law. The issues decided by the NAS panel and the *Litton* jury were altogether different and the results, therefore, cannot be considered inconsistent. Even if the NAS report could be construed as inconsistent, it could not be afforded more weight than it is due. The NAS panel was simply one of several consulting groups hired by the FCC. The panel was neither an administrative fact finding body nor a judicial one.[23]

### D. Crucial Evidence

#### The New York PSC Decision

AT & T argues that precluding the relitigation of issues in *Selectron* would be unfair because crucial evidence was unavailable in or excluded from the *Litton* trial.

First, AT & T points to the exclusion in *Litton* of *In Re New York Teleph. Co.*, 79 Pur3d 410 (N.Y.Pub.Serv.Comm'n 1969) which found that the PCA tariff was reasonable and "absolutely necessary to ensure reliable service." *Id.* at 417. The *Litton* trial court excluded this evidence on relevancy grounds because the New York PSC decision did not involve the same type of PCA device at issue in *Litton* and because the device in the New York PSC decision cost fifty cents per month, whereas the same device involved in *Litton* cost over $6.00 per month. On appeal, the Second Circuit found that the trial court erred in excluding the New York PSC decision as it was "arguably probative". The Second Circuit, however, held that exclusion of the decision was not prejudicial. 700 F.2d at 819.

I find that the erroneous exclusion of the New York PSC decision does not warrant retrying the issue concerning AT & T's bad faith filing of the PCA tariff. This court's review of *Litton* indicates that AT & T unsuccessfully introduced a substantial amount of evidence on this very point in an attempt to prove the validity of the PCA tariff. The thoroughness of AT & T's arguments on this issue during the *Litton* trial combined with the questionable probative value of the New York PSC decision suggests that it is unlikely that it's admission would affect the result of a new trial.

#### "New" Evidence

AT & T next refers this court to a 16-volume compendium of documents containing "new" evidence that it asserts would likely change the result of a subsequent trial. Typical of the contents in this compendium are the following: a 1968 video tape of a speech given by prior AT & T executive officers suggesting that the aim of the PCA tariff was to make the telecommunications market more, not less, competitive; handwritten notes by former AT & T exec-

as exhibits, received into evidence, and read to the jury. Judge Connor specifically referred to them in delivering his instructions to the jury.

23. The NAS panel consisted generally of people from outside the telephone industry. Although there were two representatives from AT & T on the panel there were no representatives from terminal equipment manufacturers.

utive John deButts to the effect that certification standards would raise costs to the average consumer; comments by state regulatory commissioners in petitions for reconsideration of the 1968 *Carterfone* decision concerning "harms to the network"; comments by state regulators to the FCC concerning the 1972 National Academy of Sciences report reflecting their opinion that the report was technically sound; testimony by state regulators in *U.S. v. AT & T* concerning economic effects of increased competition; testimony by members of the 1972 National Academy of Sciences panel indicating that AT & T did not delay the certification program; a technical report obtained in the *Phonotele* litigation showing that the Phone-mate automatic answering service presented a real hazard to the network; and views of the former FCC Chief of Common Carriers Bureau, Walter Hinchman, showing anti-AT & T bias.

The Court in *Blonder-Tongue Labs.* provides that precluding a party from relitigation could result in unfairness if "without fault of its own" that party were deprived of "crucial" evidence in the prior action. 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971); *See also* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4465, p. 609 (1981). AT & T's evidence fails to meet the criteria set forth in this standard. First, AT & T was not deprived of the evidence "without fault of its own". AT & T admits that it had much of this evidence in hand during *Litton* but for various reasons chose not to use it. A quick perusal of the evidence indicates that AT & T had or could have had practically all of the evidence it now lists. Next and more importantly, the evidence is not 'crucial' evidence as might be likely to change the outcome in a new trial. Much of the evidence AT & T refers to in this 16-volume compendium is cumulative of the 18,000 pages of testimony and 945 exhibits previously generated in *Litton*. Other of the evidence is irrelevant or otherwise inadmissible. Because AT & T's evidence is not crucial and because AT & T was not deprived of it in *Litton* 'without fault of its own', I find that no unfairness would result from applying the collateral estoppel doctrine in this case.

5. Issues as to which Collateral Estoppel is Denied

### AT & T's Refusal to Sell Inside Wiring and AT & T's Delay in Making Customer Cutovers and Providing PCA's

The *Litton* jury found that AT & T refused to sell inside wiring in bad faith, delayed in making customer cutovers in bad faith, and intentionally delayed in providing and installing PCAs. AT & T argues that the jury decided these issues only with regard to Litton and that, therefore, they should not be afforded collateral estoppel effect. Plaintiffs argue to the contrary, contending that these issues were not unique to *Litton* but instead were a part of AT & T's overall scheme of anticompetitive conduct.

In examining these issues the court finds that, contrary to defendant's assertions of uniqueness, the Second Circuit found that this conduct extended not only to *Litton* but to other competitors of AT & T. 700 F.2d at 815. However, it does not necessarily follow that the *Selectron* plaintiffs were among the other competitors affected by this conduct. Unlike AT & T's filing of the PCA tariff and opposing certification, AT & T's refusal to sell inside wiring and intentional delay in providing essential goods and services to Litton and other competitors may not have affected the Selectron plaintiffs. Because of the episodic nature of these issues this court refuses to grant them collateral estoppel effect. *See Starker v. United States*, 602 F.2d 1341, 1348–50 (9th Cir.1979).

### Standing, Injury in Fact and Proximate Cause

Plaintiffs would have this court apply the *Litton* judgment to relieve plaintiffs of the burden of proving their standing to sue, injury in fact, and proximate cause. Proof that each plaintiff suffered economic harm and that the harm was proximately caused by AT & T's unlawful conduct is essential to establish standing and entitlement to damages. *See e.g. Transamerica Com-*

*puter Co. Inc. v. IBM Corp.*, 698 F.2d 1377, 1382 (9th Cir.1983); *Windham v. American Brands, Inc.*, 565 F.2d 59, 68 (4th Cir.1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). I find it necessary that plaintiff litigate these issues.

For the foregoing reasons, it is, this 4th day of June, 1984,

ORDERED that plaintiff's motion for partial summary judgment is granted in part and denied in part. I grant plaintiff's motion to preclude relitigation of the following issues:

1. AT & T possessed monopoly power in the relevant market (i.e. the Oregon and Washington terminal telephone equipment market).

2. AT & T willfully maintained such monopoly power by predatory or anticompetitive conduct.

3. AT & T had a specific intent to obtain monopoly power in the relevant market.

4. AT & T attempted to obtain such monopoly power by anticompetitive or predatory conduct.

5. There was a dangerous probability that AT & T would succeed in obtaining such monopoly power.

6. AT & T's predatory or anticompetitive conduct included:

   a. Filing the interface device tariff in bad faith; and

   b. Opposing certification in bad faith.

I deny plaintiff's motion to preclude litigation of issues of standing, injury in fact, and proximate cause. In addition, I deny collateral estoppel with respect to the *Litton* jury findings that AT & T:

1. Intentionally delayed in providing and installing interface devices;

2. Refused to sell inside wiring in bad faith; and

3. Delayed in making cutovers in bad faith.